DECISION AND JUDGMENT ENTRY
This case is before the court on appeal from the September 13, 2001 judgment of the Lucas County Court of Common Pleas which denied appellant Toledo Edison Company's motion for judgment notwithstanding the verdict, motion for a new trial and motion for remittitur following a jury trial.
This action stems from a contract between Blake Homes, Ltd. ("Blake Homes"), a home construction company, and Toledo Edison Company ("Edison"). The parties agreed that Blake Homes would build an all-electric geothermal home and that, for a minimum of one year, Edison would pay all costs associated with the home not being sold. Edison was also to promote and advertise the home.[1]
In November 1998, Edison ceased making payments under the contract claiming it had fulfilled its obligations. Blake Homes did not agree to the termination.
On August 19, 1999, appellee commenced the instant action. Blake Homes filed a claim for breach of contract alleging that Edison failed to pay all the costs it was responsible for under the contract. Appellee also alleged two counts of negligent misrepresentation. The first count claimed that Edison negligently misrepresented that it would pay the advertising and promotional costs for the sale of the home and that such negligence damaged its line of credit. Appellee also alleged that Edison negligently made representations as to the success of Eagles Landing which induced appellee to purchase additional lots which then diminished in value. Lastly, appellee claimed that Edison fraudulently induced appellee to enter into the contract. Appellee requested consequential and punitive damages.
On February 22, 2000, appellee filed a motion for summary judgment as to its breach of contract claim. On March 24, 2000, appellant filed a motion for summary judgment as to all of appellee's claims. Both motions were denied on December 13, 2000.
The case proceeded to trial on May 22, 2001. The following relevant evidence was presented. Robert Dedo, principal manager of Blake Homes, testified that in the past twelve years Blake Homes has built 75 to 100 homes located mainly in Oregon, Lucas County, Ohio. Dedo stated that the homes he builds are in the $250,000 to $500,000 price range. Dedo explained that he has built approximately six "speck" or model homes in the past 12 years.
Dedo testified that in late 1996 into early 1997 he was contacted by Cindy Westfall of Toledo Edison regarding a new Oregon golf course subdivision, Eagles Landing Subdivision, wherein Edison had acquired a lot which was to be on two of the golf course greens.[2] Edison wanted to work with a builder to build a model home showcasing electric technologies. In particular, the home was to have a geothermal heating and cooling system.
During the course of their negotiations, Dedo testified that he requested in writing that Edison pay all the maintenance costs associated with the house until it was sold. A provision was also added, according to Dedo, which stated that the contract could be canceled prior to the actual construction of the home, provided that all start-up costs had been paid.
On March 12, 1997, the parties met to finalize the contract. Dedo testified that Gary Greulich of Edison was concerned that the contract would allow Dedo to sell the house in a month and that Edison would not get full use of the house. The parties then added language that the house had to remain a model for at least one year.
Dedo testified that in the month following the contract signing, Cindy Westfall and he met with various suppliers to see what kind of discounts they could get on higher end products. According to Dedo, Westfall kept stressing that they should put as many "ideas" into the 2,500 to 2,600 square foot house as possible.
As to the features of the house, Dedo testified that the house has three bedrooms though he paneled one of the rooms because it was to be used as the subdivision office. The house has three and one-half bathrooms, including a full bath in the basement. The lighting and electronic features are in the $20,000 to $30,000 range. The kitchen has Corian countertops and solid cherry cabinets. The roof, instead of the typical twenty-five year, has a forty year highest quality roof. The home has two patios, one patio is shaped like a golf club and the other a golf ball, located off the master suite and off the dinette. The house is also landscaped and lighted outside.
Dedo next testified regarding a letter from Westfall, dated April 22, 1997, outlining what Edison would be able to offer to suppliers and vendors. Dedo testified that much of the free advertising and exposure for the suppliers never happened. Only two seminars at the house were held (on the same day.) The house was not open every weekend as was promised.
Regarding financing for the home, Dedo testified that he took a loan out from Genoa Bank. The first loan was for $275,000. In October 1997, he took out a second loan for $100,000. According to Dedo, the total construction cost was $394,000 which did not include the price of the lot.
The house was completed on October 23, 1997. Dedo testified that Edison employees were very pleased with the house. Dedo also stated that on the day of the preview party a man came to the house and said he wanted to buy it. He then decided to have a similar house built on some acreage so he could have a barn and pond. Dedo indicated that he did receive two other offers from the same woman of $250,000 and $300,000. Dedo rejected both.
Dedo's $499,000 asking price was reduced to $479,000 for a short period of time when it was listed by a realtor. According to Dedo, Edison had agreed to rebate back to him $20,000. The house did not sell and, subsequently, Dedo raised the price back to $499,000.
Dedo agreed that Edison, from October 1997 through October 1998, complied with the contract in that it paid approximately $50,000 in costs associated with the house. However, following a letter dated October 29, 1998, Edison ceased paying the costs which, up until the date of trial, totaled $85,000.
Dedo further testified that he purchased three additional lots in the subdivision. Two of the lots were $61,655 and the third was approximately $57,000-$58,000. Dedo stated that he sold the lots at a loss. Dedo indicated that he assumed the price of the lot on which the idea house was built would be about the same.
During cross-examination, Dedo acknowledged that he had lost money on approximately four to six houses in the past. Dedo indicated that the basis of the contract between Blake Homes and Edison was that Edison wanted a geothermal all-electric home. The floor plan and amenities of the house were all chosen by Dedo. Dedo stated that many of his choices were reviewed by Westfall.
Dedo admitted that there was no discussion as to how long Edison would pay the costs. Dedo did say there was conversation regarding how long Edison wanted to use the house. He further indicated that he believed the agreement provided that Edison was to pay costs until the house was sold.
When questioned, Dedo did acknowledge that Blake Homes was promoted through his partnership with Edison. There was a very successful open house, an insert in the Toledo Blade, various trade publications, and a home show.
Martin Sutter, president/CEO of Genoa Bank testified next. Blake Homes had historically been a customer and, in 1997, Dedo came to the bank in connection with the Eagles Landing project. Sutter further indicated that he was familiar with the project because he had handled the Eagles Landing subdivision and golf course financing.
Sutter met with Dedo and Westfall to discuss the details of the house. Sutter was concerned because no similar projects had been done in Oregon and wanted to make sure it would be adequately promoted. According to Sutter, Westfall assured him that Edison was going to spend a lot for advertising.
Sutter testified that prior to the initial loan, the bank had an appraisal done on the property which was for $310,000. Sutter explained that the problem with the appraisal was that they were unable to find any comparison homes in the Oregon area. Because Edison was involved in the project, Sutter decided to proceed with the financing and lower the interest rate a quarter per cent. Sutter believed that pursuant to the contract between Blake Homes and Edison, Edison was to cover the costs of the home until it was sold.
During cross-examination, Sutter acknowledged that the promissory notes had been signed only by Blake Homes, not Edison. Further, that Genoa Bank was not a party to the contract between Blake Homes and Edison.
Realtor Brad Sutphin next testified that his main area of sales is in the Oregon area. Sutphin testified that he was contacted by Edison to market the house. The listing agreement was signed April 26, 1998, and the price was reduced from $499,000 to $479,000. Sutphin testified that at the time he listed the house he was waiting for an addendum stating that Edison was supposed to pay all commission on the house. The addendum was never signed.
Sutphin testified that he received two offers on the house from the same individual: one for $250,000 and one for $300,000. Sutphin stated that there was no way Dedo could accept such low offers but he did relay them to him. Sutphin learned that the individual making the offers was associated with Edison and offered to give free seminars to compensate for the low purchase price. Sutphin understood that Dedo would have only realized $300,000 from the sale.
When cross-examined, Sutphin did admit that he had some concerns with the home including that it was too close to industry and the access routes were unbecoming.
Eagles Landing developer Ronald Gladieux testified next. Gladieux stated that Eagles Landing bought eighty-nine of its three hundred acres from Edison. Gladieux explained that the subdivision used the idea house as a sales office for approximately three months after its completion. The office was then moved into the new condominium project in the subdivision.
Kitte Raber of Gross Electric testified regarding the lighting features of the home. Raber stated that Dedo and Westfall visited her at Gross Electric and were interested to see what the store could offer for the project. According to Raber, Dedo and Westfall told her that they wanted specialty lighting, nothing you would see in a typical house, because the house was going to be a showcase for new ideas.
Specifically, Raber testified that the house was to have the Lutron system, which operated through radio frequency and special switches, installed. Dedo received a special rate for the system of $6,000 to $8,000. Raber testified that the house had an intercom system at a discounted rate of $2,200 to $2,400. The centralized vacuum system cost approximately $1,300 and the decorative lighting fixtures were $5,000 to $6,000. Raber also did exterior landscape lighting.
Raber testified that she was told that the house was going to be open every Saturday and Sunday but that it was not. She was also told that a billboard with suppliers, which she never saw, was going to be placed outside the home. In May 1998, Raber removed the Gross Electric signs and brochures from the home because the home was not open anymore.
At the close of appellee's evidence, Edison made a motion for a directed verdict on two of appellee's claims: negligent misrepresentation and fraud. The court granted the motion as to the fraud claim only. Edison then presented its case.
Edison's first witness, Cindy Westfall Nemeth, testified by videotaped deposition. Westfall stated that she worked for Edison from 1995 to 1997, as a "builder/developer sales rep." Her job function was to promote electric technologies primarily in the building industry.
Westfall stated that she was involved in a program where Edison desired to build an electric geothermal home in Eagles Landing subdivision. Westfall contacted and met with Dedo and indicated that she "just liked him." She also felt that he was a very reputable builder.
Westfall and Dedo had several subsequent meetings to finalize the details of the project. The parties' discussions included marketing strategies and the costs associated with the house that Edison would pay. These meetings culminated into draft agreements which passed back and forth between Edison's legal department and Dedo's attorney.
Regarding the duration of the contract, Westfall testified that the parties discussed a one-year term. Edison wanted to be able to have enough time to showcase the electric technologies. Edison's desire was memorialized in a handwritten addendum to the contract which provided that the house would remain a model home for a minimum of one year or until the house was sold.
Westfall testified that Dedo alone set the purchase price for the home. He also had total discretion regarding the size, floor plan, and amenities of the house (aside from the electric technologies.)
Westfall left Edison in July 1997. She testified that she had no further knowledge regarding the marketing of the home.
During cross-examination, Westfall admitted that the "minimum of one year" language does not limit the contract to one year. Westfall also stated that the contract did not preclude Dedo from selling the house one month after it was built; however, the sale would require Dedo and Edison trying to work something out with the buyer.
Westfall did concede that she boasted to potential suppliers that Edison was going to perform marketing that "would knock your socks off." Westfall further testified that at the time she left Edison there was no formal budget for marketing and promotion of the home.
Bonnie Meridieth, Westfall's replacement, testified next. Meridieth took over the project in July 1997, and was assigned to promote the house. Meridieth testified that the first marketing Edison planned was a big open house which began with a private party that was very successful.
Meridieth then testified as to many of the activities that Edison did to promote the home. Such activities included a newsletter contained in every customer's bill, a fact sheet for a house and home show, a piece in the Sunday Toledo Blade, a geothermal promotional video which included the home, paying a $1,500 entrance fee for the Parade of Homes which included promotional costs, a seminar with two sessions, and assisting in getting the home published in various trade magazines.
During cross-examination, Meridieth explained that she was shocked to hear that the price for the house was $499,000. She did admit, however, that she was not an appraiser but had been in homes that had cost that much. She stated that though she was shocked, she never discussed the price of the home with Dedo.
Meridieth was questioned regarding a memorandum she received in January 1998, from Joe Gabrosek, Edison's residential program manager. In the memo, Gabrosek expressed his concern about Dedo's incentive to sell the house while Edison was paying all the expenses. Meridieth testified that she felt that "Bob would do everything he could to sell the house."
Real estate appraiser Ann Kaczmarek testified that she conducted an appraisal of the home at the request of Edison's attorney. Upon conducting an inspection of the house and subdivision, using a number of comparable sales, and considering the actual construction costs, Kaczmarek appraised the value of the house at $335,000 as of March 2000.
During cross-examination, Kaczmarek agreed that the house could not be replicated for $335,000. She also acknowledged that many homes in subdivisions of this type are custom built homes that would not show up in the data base, where Kaczmarek pulls her comparables, until they were again sold. She acknowledged that there is a five to seven percent margin of error in the data she receives.
Joseph Gabrosek, the residential program manager at Edison in 1997 and 1998, testified next. Gabrosek stated that his job duties were to develop marketing programs for residential heating and cooling systems and to support sales efforts. Regarding the Edison/Blake Homes contract, Gabrosek stated that he had no involvement in the actual negotiations.
Gabrosek ultimately was the individual that paid the bills submitted by Dedo. Gabrosek was unaware of any bills that were submitted that did not get paid. According to Gabrosek, the first payment was made on May 1, 1997, and the last payment on November 12, 1998.
Gabrosek testified that upon learning that the house had not sold during the open house, he became concerned that the home was priced too high. On January 7, 1998, Gabrosek wrote a memo to Meridieth and Gary Greulich expressing his concerns and providing marketing ideas.
Regarding Edison's termination of the contract, Gabrosek explained that the contract was canceled because Edison had fulfilled its obligations. Thereafter, he became aware that Dedo wanted the payments to continue.
Edison's final witness was Gary Greulich who, at the time of the contract, was Edison's sales manager in residential sales. Greulich supervised a twelve-person sales force who contacted home builders, contractors, and customers to promote energy efficient electric products.
Greulich testified that he assigned Westfall to the Eagles Landing electric/geothermal home project. Greulich, Westfall, and Dedo met together for the first time around January 1997. Thereafter, discussions continued with Westfall as the intermediary and the plan began to formulate.
Gerulich was present in March 1997, when the contract was signed. At that time, according to Gerulich, he and Dedo agreed to add language to the contract whereby the home would be open for a minimum of one year. Gerulich explained that the language was added because Edison had a large investment in the house.
Gerulich acknowledged that Edison empowered Dedo to make all the decisions regarding the details of the house. The ultimate goal was that Dedo would sell the house at a profit. Dedo would then pay Edison for the lot, Edison would buy another lot, and Dedo would build another home.
On cross-examination, Gerulich was questioned regarding a portion of the contract which allowed Edison to request competitive bids as to the upkeep services for the home. He acknowledged that no bids were ever requested.
Gerulich stated that if Dedo found a buyer within the first year after the house was completed that, despite the handwritten addendum to the contract, Dedo would have been permitted to sell. Gerulich acknowledged that absent the addendum Dedo could have sold the house in the first year. Gerulich explained that the addendum was meant to simply stress that Edison would like access to the house for at least some period of time. Gerulich admitted that absent the addendum there is nothing in the contract that limits it to one year. Gerulich did testify that he felt that the contract could be canceled by Edison pursuant to section 1.2. At the close of Edison's evidence, Edison again moved for a directed verdict and the motion was denied. At the close of all the evidence and after the admission of exhibits Edison moved a third time for a directed verdict specifically as to the two negligent misrepresentation claims. As to the claim relative to the devaluation of the lots Dedo bought, the court granted the motion. The court denied the motion as it pertained to the claim of negligent inducement to enter into the contract.
The jury returned a verdict in favor of Dedo as to both remaining claims. The jury awarded $80,750 in compensatory damages and $169,250 in punitive damages. The trial court further awarded appellee attorney fees.
Thereafter, Dedo filed a motion for prejudgment interest which was opposed. Edison's judgment notwithstanding the verdict motion, motion for a new trial and motion for remittitur was filed on July 2, 2001. Dedo filed a motion in opposition on July 31, 2001, and on September 13, 2001, the trial court granted Dedo's motion for prejudgment interest and denied Edison's joint motion. Edison then filed a notice of appeal.
Appellant now raises the following thirteen assignments of error:
 "I. The court erred in failing to grant Toledo Edison's motion for directed verdict on the contract claim.
 "II. The jury's finding that Toledo Edison breached the contract is against the manifest weight of the evidence because all costs were paid until the contract was canceled by written correspondence dated October 29, 1998.
 "III. The court erred in instructing the jury on the negligent misrepresentation claim and denying Toledo Edison's motion for directed verdict where the claim was based upon the same facts as the breach [sic] contract claim and separate damages did not arise from the negligent conduct.
 "IV. The jury's finding on the negligent misrepresentation claim was against the manifest weight of the evidence.
 "V. Toledo Edison's motion for remittitur was erroneously denied where the jury's award for damages incurred through the date of the verdict failed to account for the fact that Blake did not mitigate its damages.
 "VI. The court erred in instructing the jury on punitive damages and denying Toledo Edison's motion for directed verdict because punitive damages were not pled in count two.
 "VII. The court's failure to grant a directed verdict on the punitive damages claim and its decision to instruct on punitive damages was against the manifest weight of the evidence.
 "VIII. The court erred in instructing on punitive damages and failing to grant Toledo Edison's directed verdict [sic] because such damages are not permitted for a claim of negligent misrepresentation, absent fraud.
 "IX. The court erred in failing to enter a judgment in favor of the appellant on the punitive damage claim notwithstanding the jury's verdict.
 "X. The finding of attorney's fees is in error where the punitive damage award must be reversed.
 "XI. Plaintiff waived its right to attorney's fees by failing to make an application to determine an amount certain in the court below.
 "XII. The court erred in the awarding of prejudgment interest under Ohio Rev. Code § 1343.03(C).
 "XIII. The court erred in failing to set the prejudgment interest amount."
Appellant's first assignment of error avers that the trial court erred when it denied appellant's motion for a directed verdict as to the breach of contract claim. Civ.R. 50(A)(4) provides:
"* * *. When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."
In construing the evidence most strongly in favor of the party against whom the motion is directed, the trial court "must neither consider the weight of the evidence nor the credibility of the witnesses * * *."Strother v. Hutchinson (1981), 67 Ohio St.2d 282, 284. Additionally, where reasonable minds might reach different conclusions regarding the evidence presented and where there is substantial competent evidence to support the claim of the party against whom the motion is made, the motion for a directed verdict must be denied. Id. at 284-285; Kroh v.Continental Gen. Tire, Inc., 92 Ohio St.3d 30, 2001-Ohio-59.
In support of its argument that a directed verdict should have been granted, appellant contends that withdrawal from the contract was permitted under section 1.2. Appellee disputes that a directed verdict motion was made as to the breach of contract claim and, alternatively, if in fact it was, that there was sufficient disputed evidence presented to create a factual question for the jury.
Upon careful review of the disputed provisions of the contract, we find that appellee presented substantial evidence from which a reasonable jury could have concluded that Edison had no absolute right to withdrawal. Thus, appellant's first assignment of error is not well-taken.
In its second assignment of error, appellant contends that the jury's finding that Edison breached the contract was against the manifest weight of the evidence. Judgments or verdicts supported by some competent credible evidence as to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. C.E.Morris CO. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279, 280. The Ohio Supreme Court has stated the following in regard to weight of the evidence:
"* * * Weight of the evidence concerns `the inclination of the greateramount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greateramount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on itseffect in inducing belief.'" (Citation omitted.) (Emphasis added by Court.) State v. Thompkins (1997), 78 Ohio St.3d 380, 387.
The Ohio Supreme Court also noted that when an appellate court reverses a verdict as against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. Id.
Upon review of the testimony and evidence submitted, both Edison and Dedo presented competent evidence in support of their positions. We further find that the jury's resolution of such conflicting testimony was not against the manifest weight of the evidence. Appellant's second assignment of error is not well-taken.
Appellant next argues, in its third assignment of error, that the trial court erred in instructing the jury on the negligent misrepresentation claim and in denying appellant's motion for a directed verdict on said claim. Appellant contends that the negligent misrepresentation claim is based on the same facts as the breach of contract claim and, further, appellee sets forth no evidence of damages.
Negligent misrepresentation is established where:
 "`One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.' (Emphasis added.)" (Citations omitted.)
Delman v. Cleveland Heights (1989), 41 Ohio St.3d 1, 4.
In its complaint, Blake Homes alleged that Edison "negligently misrepresented that it would pay the advertising and promotional costs in the Contract, would market the subdivision and would directly assist in the sale of the home built by Plaintiff. Toledo Edison's acts or omissions to act have proximately damaged Blake Homes' line of credit and consequently reduced the firm's ability to generate income."
Appellant contends that there was no evidence presented that Edison misrepresented its commitment to advertise and promote the home or that Blake Homes' line of credit was damaged such that it affected its ability to generate income. Conversely, appellee argues that the testimony of Martin Sutter, president of Genoa Bank, evidences that Blake Homes suffered credit damage. The testimony provides as follows:
 "Q: And there was lending of 3 quarters of a million to a million dollars you thought from your bank, correct?
"A: Uh-huh.
 "Q: And I assume that's how you make your money in that Genoa Banking made money from that, correct?
"A: I like to think we make money.
"Q: That's what you're in business to do, isn't it?
"A: Uh-huh.
 "Q: And when you got to the point when you said that this year that your patience was running out on the return of this loan that you're fulfilling that duty, correct?
"A: Yes."
Appellee has provided no additional evidence of damages and, upon review of Martin Sutter's testimony, we find that Sutter never testified that Genoa Bank would not extend credit to Blake Homes or that the contract between Blake Homes and Edison hurt their business relationship in any way. Further, our independent review reveals no additional evidence upon which appellee can claim damages for negligent misrepresentation. Thus, construing the evidence most strongly in favor of appellee, we find that the trial court erred in denying appellant's motion for a directed verdict as to appellee's remaining negligent misrepresentation claim. Appellant's third assignment of error is well-taken.
Appellant, in its fourth assignment of error contends that the jury's finding on the negligent misrepresentation claim was against the manifest weight of the evidence. Based upon our disposition of appellant's third assignment of error, we find appellant's fourth assignment of error moot.
Appellant's fifth assignment of error argues that the trial court erred when it denied Edison's motion for remittitur. Specifically, Edison claims that the jury's award failed to account for the fact that Blake Homes did not mitigate its damages.
Remittitur has long been used by trial courts to reduce excessive jury awards. Where there is no evidence that a jury's award was influenced by passion or prejudice, but the trial court nonetheless determines that the award was excessive, the trial court may permit a remittitur rather than grant a new trial. Larrissey v. Norwalk Truck Lines, Inc. (1951),155 Ohio St. 207, 219. Remittitur may only be granted where a trial court can affirmatively find that a jury's verdict is manifestly excessive. Betz v. Timken Mercy Med. Ctr. (1994), 96 Ohio App.3d 211,218.
Here, appellant contends that Dedo overbuilt the house and refused to lower the selling price or accept various offers on the home. Upon review of the evidence presented to the jury, however, we find that the award was not manifestly excessive. The only offer to purchase the house for the selling price was from an individual who eventually determined that he needed acreage for a barn to house his auto collection. The only other offers were for $250,000 and $300,000, far less than the $394,000 cost of the house and undetermined cost of the lot. Further, Edison, through its employee Cindy Westfall Nemeth, oversaw the purchase of many of the amenities that went into the home. Accordingly, we find that appellant's fifth assignment of error is not well-taken.
Appellant's sixth, seventh, eighth and ninth assignments of error dispute the trial court's refusal to dismiss appellee's punitive damages claim or vacate the subsequent jury award. Based upon our disposition of appellant's third assignment of error, we find that the punitive damages award must necessarily fail. Accordingly, we find appellant's sixth, seventh, eighth and ninth assignments of error moot.
Appellant's tenth and eleventh assignments of error concern the trial court's award of attorney fees. Because we have found that the trial court erroneously failed to dismiss appellee's negligent misrepresentation claim and, thus, appellee's punitive damages claim we find that appellee is not entitled to attorney fees. Accordingly, appellant's tenth assignment of error is well-taken and appellant's eleventh assignment of error is moot.
Appellant's final two assignments of error, Assignments of Error Nos. XII and XIII, dispute the trial court's award of prejudgment interest under R.C. 1343.03(C).[3] Appellant, in its twelfth assignment of error, disputes the trial court's finding that appellant failed to make a good faith effort to settle the case.
R.C. 1343.03(C) allows a prevailing party in a "tortious conduct" civil action to recover prejudgment interest. Based upon our determination that the trial court should have granted a directed verdict as to appellee's negligent misrepresentation claim, we find that appellee is not entitled to prejudgment interest under R.C. 1343.03(C). See Miller v.Wikel Mfg. Co. (1989), 46 Ohio St.3d 76, 80; Lavelle v. Gettling, Inc. (Mar. 15, 2001), 8th Dist. No. 77684 (where tortious conduct claims dismissed, no prejudgment interest available under R.C. 1343.03(C)).
We note, however, that our determination relative to R.C. 1343.03(C) does not affect appellee's award of prejudgment interest under R.C.1343.03(A)[4] for breach of contract. See Brittain v. Jelenic, 11 Dist. No. 2001-L-099, 2002-Ohio-2974 (awards of prejudgment interest arising out of breach of contract is governed by R.C. 1343.03(A)). Blake Homes, in its motion for prejudgment interest, specifically requested prejudgment interest "based on contract." In its September 13, 2001 judgment, the trial court, in awarding prejudgment interest, found that appellant engaged in "tortious conduct" and that appellant had "breached its contract." Thus, appellee is entitled to prejudgment interest on its breach of contract damages.
Based on the foregoing, we find that appellant's twelfth assignment of error, which is limited to the trial court's award of prejudgment interest under R.C. 1343.03(C), is well-taken.
Appellant's thirteenth assignment of error argues that the trial court erred in awarding prejudgment interest but failing to set the amount. Appellee does not dispute that the amount needs to be calculated by the trial court. Accordingly, we find that appellant's thirteenth assignment of error is well-taken.
On consideration whereof, we find that substantial justice was not done the party complaining and the judgment of the Lucas County Court of Common Pleas is reversed, in part, and affirmed, in part, and remanded for proceedings consistent with this decision. Costs of this appeal are assessed equally to appellant and appellee.
JUDGMENT AFFIRMED IN PART AND REVERSED IN PART.
Peter M. Handwork, J., Richard W. Knepper, J., and Mark L.Pietrykowski, P.J., CONCUR.
[1] The March 12, 1997 contract provides, in part:
 "1.2 This project and the obligations under this agreement may be canceled at any time prior to the substantial initiation of the construction process. Upon the initiation of construction the obligations under this agreement may not be canceled without the payment of all costs incurred by Blake Homes for items which are normally used in preparation of construction including prints, permits, and design costs.
 "1.3 Costs: The following is a list of the costs that are to be assumed and paid by Toledo Edison during the term of this Agreement and/or until the ultimate purchaser of the geothermal model home has taken possession of the home and the home is no longer a model.
"* * *
 "Project will remain a model home for a minimum of one year or until sold to end-user."
[2] Edison originally owned a large portion of the land purchased by the Eagles Landing Subdivision and golf course developers.
[3] R.C. 1343.03(C) provides:
 "Interest on a judgment, decree, or order for the payment of money rendered in a civil action based on tortious conduct and not settled by agreement of the parties, shall be computed from the date the cause of action accrued to the date on which the money is paid if, upon motion of any party to the action, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case."
[4] R.C. 1343.03(A) provides:
 "In cases other than those provided for in sections 1343.01 and 1343.02 of the Revised Code, when money becomes due and payable upon any bond, bill, note, or other instrument of writing, upon any book account, upon any settlement between parties, upon all verbal contracts entered into, and upon all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of tortious conduct or a contract or other transaction, the creditor is entitled to interest at the rate of ten per cent per annum, and no more, unless a written contract provides a different rate of interest in relation to the money that becomes due and payable, in which case the creditor is entitled to interest at the rate provided in that contract."